[921 NYS2d 20]

MARY MASILLO, Appellant, v ON STAGE, LTD., et al., Respondents.

First Department, March 24, 2011

### APPEARANCES OF COUNSEL

*Taubman Kimelman & Soroka, LLP*, New York City (*Antonette M. Milcetic* of counsel), for appellant.

*Barry McTiernan & Moore*, New York City (*Laurel A. Wedinger* of counsel), for On Stage, Ltd., respondent.

*Eustace & Marquez*, White Plains (*Edward M. Eustace* of counsel), for Queens Theatre in the Park, Inc., respondent.

### OPINION OF THE COURT

GONZALEZ, P.J.

On April 12, 2005, plaintiff Mary Masillo, an assistant teacher, accompanied teacher Madelaine Riback and a number of other chaperones on a school field trip. They took 72 prekindergarteners to a 10:00 A.M. puppet show at Queens Theatre in the Park (Queens Theatre), an enclosed auditorium. Plaintiff testified at her deposition that she seated her assigned children, that she proceeded to her seat, and that as she put her foot out to go down a step, the house lights went off without warning. She fell to her knees and was injured. Masillo testified that she saw an illuminated strip of lights on the front of the steps as she attempted to get up.

Plaintiff commenced the instant action against defendant Queens Theatre, the owner of the premises, and defendant On Stage, Ltd., the production company that rented the theater for the show. In her complaint, she alleged that defendants were negligent in failing to maintain the premises in a reasonably safe condition due to "the lack of adequate and/or appropriate lighting" in the theater. Her bill of particulars amplified her claim, stating, "The dangerous conditions complained of herein are with respect to inadequate and/or improper lighting within the theater and/or inadequate training of the theatre personnel in turning off the 'house' lights while the spectators were still finding their seats."

During discovery, Queens Theatre's managing director, Robert Kaplan, and On Stage's artistic coordinator, Joan Lavin,

were deposed. Kaplan testified that the regular practice with respect to lighting at the theater was that an individual located in a booth above the rear seats operated the lights, and that after a brief introduction and welcome speech, the stage manager told that individual to turn down the house lights. When the house lights are turned off, the lights across the steps in the aisles automatically go on. Lavin testified that her company had used the theater for 10 to 20 years, and related the theater's common practice with respect to lighting at the commencement of her company's performances, although she was not at the performance on the date of plaintiff's accident:

> "Q. In your experience when you were there, would the lights go out in the theater before everyone was seated?
>
> "A. No.
>
> "Q. That would never happen?
>
> "A. *No, they wouldn't go out, they would dim, maybe.*
>
> "Q. *What does that mean?*
>
> "A. *They would be on dim; not completely black, never completely black, because there are little lights on the stairs*" (emphasis supplied).

Kaplan gave the following testimony in response to plaintiff's counsel's questions:

> "Q. With [an outside production company] such as the one on April 12, 2005, how does your lighting person know when to dim the lights for the show?
> . . .
> "A. On Stage tells us they're ready.
>
> "Q. How do they tell you they're ready?
>
> "A. Physically tells us. There's a lady whose name I usually forget. After the counting is done, she says, 'Okay, we're ready to go.' Whoever's making the speech goes on stage, makes the speech, gives out the little goodies, goes behind the curtains *and the stage manager, by microphone, communicates to the lighting person, you know, houselights [sic] down, or whatever the instructions are*[.]
>
> "Q. So your stage manager communicates to your lighting person to lower the lights?

"A. Yes." (Emphasis supplied.)

Plaintiff's counsel then elicited the following testimony from Kaplan:

"Q. And I just want to be sure. What I said before, the dimming of the lights when the show is to begin, in a situation like on April 12, 2005, the rental situation, that's in the sole discretion of the stage manager when the lights go down? Is that your testimony, the stage manager contacts the lighting and says lower the lights?

"A. We work—could I elaborate on it?

"Q. Absolutely.

"A. We work in support of the rental. We take direction from the renter. When they start the show, they tell us they're ready and we go forward; the procedure . . .

"Q. Does anybody on the theater staff, before the lights go down, check to make sure everybody is seated?

"A. No. . . .

"Q.[W]hen the speeches are over, it's still your stage manager telling your lighting person to go ahead and dim the lights?

"A. But if Joan Lavin does the speech, *she comes backstage and she'll tell our stage manager, let's go*" (emphasis supplied).

Photographs were also produced in discovery that confirm the presence of black rubber strips containing approximately 10 illuminated lights across the front of each of the aisle steps.

Queens Theatre and On Stage moved separately for summary judgment. The grant of On Stage's motion is not at issue on this appeal. Queens Theatre argued that there was no defective condition on its property that was responsible for plaintiff's injuries. It contended that the theater was in compliance with all building codes and regulations for the lighting of audience areas during the presentation of plays, concerts, and other such events. It was Queens Theatre's position that despite adequate lighting "[p]laintiff simply misstepped."

In support, Queens Theatre submitted the detailed affidavit of a licensed professional engineer, who researched the archived

building records for Queens Theatre, including all renovations made after the building was constructed, and conducted tests at the premises under both daytime and nighttime performance lighting conditions to determine whether the theater was in compliance with building codes for the City of New York. The expert stated that regulation of theater illumination is governed by the Life Safety Code of the National Fire Protection Association (NFPA 101). In April 2005, when plaintiff's accident occurred, the 2003 edition of the NFPA Code (NFPA 101-2003) was in effect. It provided: **"Illumination of Means of Egress. General**. In assembly occupancies, the illumination of the floors of exit access shall be at least 0.2 ft-candle during periods of performance or projections involving directed light" (NFPA 101-2003, § 7.8.1.3 [3]). Relying upon plaintiff's deposition testimony as to where she fell, the expert measured the lighting at the top two steps of both middle aisles, at the upper and lower limits of performance lighting, during both morning and evening performances. He found that the illumination in those locations, where plaintiff claimed to have been standing, exceeded the required 0.2 ft-candle when the house lights were turned off. This level of lighting is in compliance with the standards promulgated in the NFPA 101 Code.

Accordingly, the expert gave his opinion, with a reasonable degree of engineering certainty, that the light levels in the Queens Theatre complied with, and even exceeded, generally accepted standards (i.e., the NFPA Code) for the lighting of audience areas during the presentation of plays, concerts, and other such events, and that they were safe, adequate, and consistent with light levels required at theaters and cinemas throughout the United States.

In opposition, plaintiff stated that the actionable negligence was not inadequate lighting, but rather "negligent . . . *operation* of the lights." She argued that the record raised a material issue of fact as to whether someone gave a premature cue to the Queens Theatre lighting employee to turn off the lights while patrons were still being seated.

In support, plaintiff submitted an affidavit by Madelaine Riback, the aforementioned teacher. Riback was seating a group of students in another area of the theater when the lights went off, and she also fell. She stated that "[w]hile [she] was still seating the children in [her] group, the theater suddenly went completely dark," that no announcements were made prior to turning the lights off, and that there was no flickering or grad-

ual dimming of the lights. Riback stated that she also lost her footing on the steps of the aisle and injured her knee.

The court granted Queens Theatre's motion. It found that Queens Theatre established prima facie that there was adequate lighting in the theater, and that plaintiff failed to raise a triable issue of fact based upon the manner in which the lights were turned off. The court noted that plaintiff conceded seeing the illuminated lights on the strips of the steps after she fell. Plaintiff appeals, and we affirm.

A landowner has a duty to maintain its property "in a reasonably safe condition in view of all the circumstances, including the likelihood of injury to others, the seriousness of the injury, and the burden of avoiding the risk" (*Basso v Miller*, 40 NY2d 233, 241 [1976] [internal quotation marks omitted]). Landowners and tenants who operate places of public assembly, such as theaters, are similarly "charged with the duty of providing the public with a reasonably safe premises, including a safe means of ingress and egress" (*Peralta v Henriquez*, 100 NY2d 139, 143 [2003] [internal quotation marks and citation omitted]; *Knickerbocker v Ulster Performing Arts Ctr.*, 74 AD3d 1526 [2010]).

As the motion court found, through the testimony of plaintiff, Lavin and Kaplan and the expert affidavit, Queens Theatre established that it provided the public with a reasonably safe premises insofar as its lighting was concerned. Photographs in the record confirm the existence of strips of lights on the stairs, and plaintiff's concession that she saw those lights after her fall was consistent with Lavin's testimony that those lights go on when the house lights are turned off.

Plaintiff failed to raise an issue of fact with Riback's affidavit. She presented no evidence to controvert the conclusions of the theater's expert, and produced no expert of her own. Queens Theatre did not have a rule requiring that the lights be flashed or dimmed before going off, and there is no common-law authority prescribing this procedure (*see generally Gilson v Metropolitan Opera*, 5 NY3d 574, 577 [2005]). Plaintiff's alternative contention, that the house lights should not have been turned off until everyone was seated, amounts to a prescription of conduct exceeding the duty of reasonable care (*see id.*).

*Gilson* is one of two recent Court of Appeals decisions that are instructive as to the parameters of a theater owner's duty of care to patrons. There, the plaintiff was injured when another audience member fell onto her while attempting to return to his seat after the performance had begun. The Court of Appeals

found that an internal policy requiring that during the performance ticket holders be assisted to their seats by escorts with flashlights prescribed conduct transcending reasonable care and that evidence of its violation did not constitute negligence (*id.* at 577).

In the other case, *Branham v Loews Orpheum Cinemas, Inc.* (8 NY3d 931 [2007]), the plaintiff was injured when returning to her seat from the restroom mid-movie; she tripped over a boy who was sitting in the aisle of the theater. The theater showed that wall sconces were dimmed during the movie but that the aisle lighting remained on, illuminating a path to the front row (*see* 31 AD3d 319, 324-325 [2006]). Plaintiff submitted her testimony that she saw no lights in the theater (*id.* at 325). The Court of Appeals found, inter alia, that plaintiff failed to raise a triable issue of fact whether the lighting in the theater was inadequate.

While *Gilson* and *Branham* do not address the exact theory propounded by the instant plaintiff—negligent operation of the lighting—both illustrate a tension inherent to the proper operation of a theater, that is, the need for sufficient light for patrons to move around, and sufficient darkness for patrons to see the performance comfortably. In determining whether a theater owner maintained its premises in a reasonably safe condition, both sides of this tension must be considered (*see Basso*, 40 NY2d at 241).

The dissent concludes that the surprise of having the lights suddenly being turned off created a dangerous condition. However, a patron of a theater expects that the lights in the theater will be turned off before the show begins, and there is no evidence here that the lights were turned off in a negligent fashion. Queens Theatre had no written policy regarding turning the house lights off gradually, and, contrary to the dissent's view, the deposition testimony regarding the theater's customary practice does not indicate that it ever "gradually dim[med]" the house lights.

The dissent states that plaintiff provided sufficient evidence of negligence based upon "the nature of the *operation* of the lighting." However, a theater owner breaches a duty to its patrons in the operation of the lighting when it creates a dangerous state of darkness. In the instant case, there is ample evidence that the end result of the alleged negligent operation of the lights was not inadequate lighting. Lavin testified that dimming occurred because the house lights were turned off at the time that the stair lights were turned on. Plaintiff similarly

testified that she saw lighting on the stairs after she fell. The expert confirmed that the lighting in the theater exceeded the standard prescribed by applicable regulations.

Viewing the facts in the light most favorable to plaintiff, we find that no act or omission on the part of Queens Theatre proximately caused her injuries. Thus, the motion court correctly granted Queens Theatre's motion for summary judgment dismissing the complaint as against it.

Accordingly, the order, Supreme Court, Bronx County (Cynthia S. Kern, J.), entered July 28, 2009, which, insofar as appealed from as limited by the briefs, granted defendant Queens Theatre's motion for summary judgment dismissing the complaint as against it, should be affirmed, without costs.

ACOSTA, J. (dissenting). Because I believe plaintiff has raised a triable issue of fact whether defendant Queens Theatre in the Park created a dangerous condition, I respectfully dissent.

On April 12, 2005, plaintiff, a paraprofessional, along with two teachers, another paraprofessional, a "Family Assistant" and nine parents, accompanied a group of 72 prekindergarten children on a field trip to Queens Theatre to see a show presented by defendant On Stage. Upon arrival at the theater, plaintiff escorted the children inside and seated them. Then she headed toward her seat. Plaintiff testified that, as she put her foot out to go down a step, the house lights were turned off suddenly, causing her to fall on her hands and knees and she was injured. Plaintiff testified further that no warning or announcement was given before the lights went out.

Plaintiff thereafter commenced the instant action, alleging that "[t]he dangerous conditions complained of . . . are with respect to inadequate and/or improper lighting within the theater and/or inadequate training of the theater personnel in turning off the 'house' lights while the spectators were still finding their seats."

Supreme Court granted Queens Theatre's motion for summary judgment, finding that Queens Theatre established prima facie that there was adequate lighting at the theatre. The court further found, and the majority agrees, that plaintiff failed to raise a triable issue of fact as to the adequacy of the lighting. I disagree. Viewing the facts in the light most favorable to plaintiff, I find that defendant failed to meet its prima facie burden, and therefore would reverse.

The conclusion that there was adequate lighting in the theater misses the mark. Plaintiff's claim is that Queens Theatre

created a dangerous condition by suddenly and without warning turning off the lights, and that this negligent operation of the lights was the reason for her fall (*see Peralta v Henriquez*, 100 NY2d 139, 143 [2003] ["(W)henever the general public is invited into . . . places of public assembly, the owner is charged with the duty of providing the public with a reasonably safe premises, including a safe means of ingress and egress" (internal quotation marks and citation omitted)]).

Joan Lavin, On Stage's artistic coordinator, and Robert Kaplan, the managing director of Queens Theatre, testified that ordinarily someone from On Stage or Queens Theatre gave a speech before a show began, while the patrons were being seated and the house was fully lit and that, after the speech ended, the lights were *dimmed*. However, Lavin was not at the theater on the day of the accident. And Kaplan was not sure if he was at the theater on the day of plaintiff's accident.

In opposition, plaintiff submitted the affidavit of Madelaine Riback, the teacher with whom plaintiff worked, who also stated that while she was seating the children in her group, "the theater. . . went completely dark," and that she too lost her footing on the steps and injured her knee. This evidence raises an issue of fact as to whether the theater was gradually dimmed or whether the sudden turning off the lights created a dangerous condition. The relevant issue therefore, is not whether the theater had adequate lighting, but whether Queens Theatre was negligent in the *operation* of the lighting.

Even if defendant had met its prima facie burden, on this record, plaintiff sufficiently raised issues of fact which precluded summary judgment in favor of Queens Theatre. While Queens Theatre's witnesses testified that the normal procedure was to gradually dim the lights, they were not present on the day of the accident. Therefore, plaintiff's testimony, which is corroborated by Riback's testimony that the lights suddenly went out, remains uncontroverted. The inference is that the surprise of having the theater suddenly go completely dark created a dangerous condition. It is reasonably foreseeable that a person walking mid-step in a theater will be startled or momentarily thrown off or disoriented if suddenly and without warning the theater is encased in total darkness, even for a brief moment. (*See Trincere v County of Suffolk*, 90 NY2d 976, 977 [1997] ["(W)hether a dangerous or defective condition exists on the property of another so as to create liability. . . is generally a question of fact for the jury" (internal quotation marks and citation omitted)].)

It was also error for the motion court to grant summary judgment to Queens Theatre based in part on the fact that plaintiff acknowledged that she noticed that the step lights of the theater were illuminated at the time of her fall. Plaintiff testified that she only noticed the step lights after she had fallen and was helped up off the floor. In other words she became aware of the step lights only after the dangerous condition was created. Indeed, Mr. Kaplan testified that it is only "when the other lights go off, [the step] lights go on." Based on Mr. Kaplan's testimony, and given the fact that adaptation to darkness is delayed by extended exposure to bright light, I believe the motion court erred to find as a matter of law that the presence of the strip lights warranted summary judgment (*see* Russ, Freeman, McQuade and Stewart, 1 Attorneys Medical Advisor § 3:68, at 3-55 [2005]).

I also disagree that plaintiff needed to contradict Queens Theatre's expert's opinion that the lighting in the theater was in compliance with the Life Safety Code of the National Fire Protection Association. Indeed, plaintiff concedes the lighting complied with or exceeded the relevant standards. Plaintiff provided sufficient evidence that on the date of her accident Queens Theatre's negligence was in the nature of the *operation* of the lighting. Moreover, while it is true that a patron of a theater expects the lights to be turned off before a show begins, consistent with Queens Theatre's witnesses' testimony, I do not believe that the patron expects this to be done suddenly and without warning.

Finally, *Branham v Loews Orpheum Cinemas, Inc.* (31 AD3d 319 [2006], *affd* 8 NY3d 931 [2007]), on which Queens Theatre relies, is distinguishable from this case. The plaintiff in *Branham* claimed that the lighting in the theater where her accident occurred was inadequate, causing her to trip over a boy seated in the aisle. There was no argument advanced that the manner in which the defendant dimmed the lights was negligent.

RICHTER and ABDUS-SALAAM, JJ., concur with GONZALEZ, P.J.; CATTERSON and ACOSTA, JJ., dissent in a separate opinion by ACOSTA, J.

Order, Supreme Court, Bronx County, entered July 28, 2009, affirmed, without costs.